# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION MDL

C/A No.
2:20-cv-422-RMG

------------------------------------------------------------------------X

FAIRBANKS NORTH STAR BOROUGH,

*Plaintiff,*

*-against-*

**VERIFIED COMPLAINT**

3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., ANGUS INTERNATIONAL SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, E.I DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARCHROMA MANAGEMENT LLC, ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a ASAHI GLASS CO. LTD., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., AMEREX CORPORATION, KIDDE-FENWAL, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., UNITED TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., CLARIANT CORPORATION, and BASF CORPORATION,

**Jury Trial Demanded**

*Defendants.*

------------------------------------------------------------------------X

Plaintiff, FAIRBANKS NORTH STAR BOROUGH, by and through its attorneys, Napoli Shkolnik PLLC, as and for its complaint against Defendants, 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., ANGUS INTERNATIONAL

SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, E.I DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARCHROMA MANAGEMENT LLC, ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a ASAHI GLASS CO. LTD., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., AMEREX CORPORATION, KIDDE-FENWAL, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., UNITED TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., CLARIANT CORPORATION, and BASF CORPORATION, (collectively "Defendants") alleges, upon information and belief, as follows:

## NATURE OF THE CASE

1.    Fairbanks North Star Borough ("Borough" or "Plaintiff") is a borough located in the state of Alaska.

2.    Plaintiff brings this action to recover damages incurred and to be incurred by the Borough in investigating, monitoring, remediating, and otherwise responding to the PFOA/PFOS water contamination to stem the threat to public health and the environment caused by defendants' AFFF products.

3.    The groundwater in the Borough has been contaminated by per- and polyfluoroalkyl substances (collectively "PFAS").

4.    PFAS was an integral part of AFFF that was used for decades during operations

and fire training sessions at Fairbanks Regional Fire Training Center ("RFTC"). PFAS seeped into the groundwater at the site and the surrounding area, causing multiple wells to exceed state and federal regulatory limits for these toxic chemicals.

5.    All Defendants manufactured, marketed, and sold AFFF used at bases and fire training facilities and other locations throughout the country, including in Alaska.

6.    Defendants were aware that PFAS chemicals are toxic to animals and humans, do not biodegrade, are persistent in the environment, move easily through soil and groundwater, and pose a significant risk to the environment and human health. Nevertheless, they elected to manufacture, market, and sell these chemicals, placing profits over human health and the environment.

7.    Defendants designed, manufactured, marketed, and sold their products with knowledge that large quantities of PFAS would be stored, used, and maintained in such a manner that these toxic chemicals would be released into the environment, contaminating the air, soil, and groundwater.

8.    AFFF products containing PFAS were purchased, consumed, used, mixed, stored, handled, transported, discharged, released, and/or disposed of in the State.

9.    As a result, PFAS leached into the air, soil, and groundwater at and surrounding the Borough-owned sites, contaminating the environment and poisoning the groundwater on and off site.

10.    Plaintiff has incurred and will continue to incur testing, monitoring and remediation costs in response to the above contamination.

11.    In addition, Plaintiff will have to provide for the extension of public water mains and to connect properties served by contaminated private wells to these mains and to a safe, clean

3

water supply.

12.    These and other costs have been and will be incurred by Plaintiff as a direct and proximate result of Defendants' wrongful acts and omissions.

13.    Plaintiff should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.

14.    Through this action, Plaintiff seeks compensatory damages for injury to its property, including but not limited to soil and groundwater, and for the diminution of its property's value; for the costs to investigate, remediate, and monitor PFAS levels including at the Hez Ray Sports Complex and other locations located in the Borough, and in the soil and groundwater contaminated by the historical use of AFFF; for the reimbursement of regulatory oversight; and for the potential costs associated with connecting said business to the public water system where the groundwater beneath private property has become contaminated with PFAS.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1332(a), as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

16.    Pursuant to the case management orders of this Court in MDL No. 2:18-mn-2873-RMG (CMO 3), this complaint is being filed directly with this Court.

17.    For purposes of the claims alleged in this Complaint, the District of Alaska shall be the home venue, defined as the proper venue of origin where the claim could have otherwise been brought pursuant to 28 U.S.C. § 1391.

## PARTIES

**Plaintiff**

18.     Fairbanks North Star Borough is located in the state of Alaska, with its principal place of business located at 907 Terminal St. Fairbanks, AK 99701.

19.     Plaintiff owns water supply wells and other infrastructure that have been impacted by the contamination described herein.

20.     In carrying out its powers, purposes and duties, Plaintiff is acting in all respects for the benefit of the people it serves, for the protection of their health, welfare, and prosperity.

**Defendants**

21.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

22.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

23.     At all times relevant to this litigation, each of the Defendants designed, developed, manufactured, marketed and sold AFFF products containing PFAS in Alaska, which was then distributed and used for firefighting exercises throughout the State.

24.     At all times relevant to this litigation, Defendants were legally responsible for and committed each of the tortious and wrongful acts alleged in this Complaint.

25.     Defendants' wrongful actions and omissions resulted in the contamination of the groundwater in the Borough with PFAS and caused Plaintiff's damages.

26.     **3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M Company")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55144.

27.     Beginning before 1970 and until at least 2002, 3M Company manufactured, distributed, and sold AFFF containing PFAS.

28.     **Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized and existing under the laws of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

29.     **Chemguard, Inc.** is a corporation organized and existing under the laws of Texas, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

30.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

31.     On information and belief, Chemguard is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

32.     **Tyco Fire Products L.P. ("Tyco")** is a limited partnership organized under the laws of Delaware, with its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446.

33.     On information and belief, Tyco is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

34.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

6

35.    Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFAS. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFAS.

36.    On information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard products through its Chemguard Specialty Chemicals division.

37.    **National Foam, Inc.** ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382.

38.    On information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd.

39.    **Angus International Safety Group, Ltd.** is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom LA2 7NA. Upon information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

40.    **Angus Fire Armour Corporation** ("Angus Fire") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

41.    On information and belief, Angus Fire is a subsidiary of Angus International Safety Group, Ltd.

42.    **E.I. DuPont de Nemours & Company ("DuPont")** is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805.

7

43. DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

44. DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

45. In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

46. The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

47. **The Chemours Company ("Chemours")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

48. Chemours is a successor in interest to DuPont Chemical, as described above.

49. **The Chemours Company FC LLC ("Chemours FC")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

50. Chemours FC is a successor in interest to DuPont Chemical, as described above.

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

8

51.     **Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

52.     **Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

53.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

54.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

55.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

56.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

57.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

58.     Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

59.    **Archroma Management LLC ("Archroma")** is a foreign corporation existing under the laws of the country of Switzerland and having a principal office at Neuhofstrasse 11, 4153 Reinach, Switzerland.

60.    Archroma is a provider of dyes and specialty chemicals serving textiles, packaging, paper, coatings, adhesives and sealant markets.

61.    In 2013, it acquired the Textile Chemicals, Paper Specialties, and Emulsions businesses from Clariant Corporation in 2013, a successor to Sandoz Chemical Corporation, both of which conducted business in New York.

62.    **Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

63.    Arkema Inc. develops specialty chemicals and polymers.

64.    Arkema, Inc. is an operating subsidiary of defendant, Arkema France, S.A.

65.    **Arkema France S.A. ("Arkema France")** is a publicly traded foreign corporation with its principal place of business in Colombes, France.  Arkema France S.A. is the parent corporation of defendant, Arkema Inc.

66.    Arkema France and Arkema Inc. are collectively referred to herein as "Arkema".

67.    **AGC, Inc. f/k/a Asahi Glass Co. Ltd. ("AGC")** is a foreign corporation organized under the laws of Japan, having a principal place of business in Tokyo, Japan.

68.    AGC manufactures specialty chemicals. It offers glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

69.    **Daikin Industries, Ltd.** is a corporation organized under the laws of Japan, having its principal place of business in Osaka, Japan.

70.    **Daikin America, Inc.** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

71.    Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd.

72.    It is a developer and manufacturer of fluorochemical products, including fluoropolymers, fluoroelastomers, and fluorocarbon gas.

73.    Daikin Industries, Ltd. and Daikin America, Inc. are collectively referred to herein as "Daikin."

74.    **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

75.    On information and belief, Dynax (f/k/a Daikin-R/M Co, Ltd.) entered the AFFF business in 1991, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

76.    **Solvay Specialty Polymers, USA, LLC ("Solvay")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 4500 McGinnis Ferry Road, Alpharetta, GA 30005.

77.    **Amerex Corporation ("Amerex")** is a corporation having principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

78.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

79.     **Kidde-Fenwal, Inc. ("Kidde-Fenwal")** is a corporation organized under the laws of Delaware, having a principal place of business at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

80.     Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

81.     **Kidde P.L.C., Inc. ("Kidde P.L.C.")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at One Carrier Place, Farmington, Connecticut 06034.

82.     **UTC Fire & Security Americas Corporation, Inc. ("UTC Fire")** is a North Carolina corporation, having a principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

83.     On information and belief, UTC Fire acquired Kidde P.L.C. in 1991 and joined it with Chubb.

84.     On information and belief, UTC Fire is a subsidiary of United Technologies Corporation.

85.     **United Technologies Corporation ("United Technologies")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

86.    **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

87.    **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

88.    On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, inc.

89.    **BASF Corporation, ("BASF")**, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

90.    On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

91.    On information and belief, BASF Corporation is the successor in interest to Ciba, Inc., a Swiss specialty chemicals company.

### FACTUAL ALLEGATIONS AS TO ALL COUNTS

**PFOA and PFOS and Their Risk to Public Health and the Environment**

92.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial

products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

93.    The two most widely studied types of these substances are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

94.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

95.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

96.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

97.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

98.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant

periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

99.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

100.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

101.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

102.    PFAS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney, and liver.

**Defendants' Manufacture and Sale of PFAS Despite Known Risks**

103.    In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

104.    3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

105.    Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

106.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have

alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

107.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

108.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

109.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

110.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

111.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

112.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M Company listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M Company and DuPont" as support for this statement.

On information and belief, 3M's MSDS's for AFFF, which contained PFOA, did not provide similar warnings.

113.    In an attempt to limit liability, 3M Company opted to stop producing PFAS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

114.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

115.    3M Company did not comply with its duty under TSCA, and, in April 2006, it agreed to pay EPA a penalty of more than $1.5 million for, among other things, its failure to disclose studies regarding PFAS dating back decades.

116.    DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFOA.

**Defendants' Manufacture and Sale of AFFF Despite Known Risks**

117.    In 1951, 3M began selling its PFAS to other chemical companies, including DuPont.

118.    Other companies, including Defendants, began manufacturing AFFF using PFAS that they produced themselves or purchased from other companies.

119.    Defendants voluntarily elected to include PFAS in their AFFF.

120.    Defendants knew or should have known that PFAS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

121.    Nevertheless, Defendants manufactured, marketed, and sold their AFFF with the knowledge that PFAS would be released into the environment in firefighting training and rescue exercises, inadvertent releases, as well as in emergencies.

122.    Upon information and belief, instructions, labels and material safety data sheets for AFFF provided by Defendants did not, for significant time periods, fully describe the health and environmental hazards of AFFF, which Defendants knew or should have known at the time of distribution.

123.    Upon information and belief, Defendants knew of these health and environmental hazards for years, yet failed to warn the users and other sensitive receptors, such as public water providers.

124.    AFFF concentrate containing PFAS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

125.    Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF, used AFFF containing PFAS for decades for firefighting and training.

126.    These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells throughout the country with PFAS.

127.    On information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFAS would very likely injure and/or threaten public health and the environment.

128.    On information and belief, this knowledge was accessible to all Defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following Defendants are and/or were members of this trade association: 3M Company, Tyco/Ansul, Chemguard, and National Foam/Angus.

129.    Additionally, on information and belief, all Defendants knew or should have known that their AFFF products and the PFAS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in, at least, 1976.

130.    In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

131.    There is no natural sink for AFFF containing PFAS. Except for incineration above 10,000 degrees, Defendants' PFAS will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

132.    Plumes of PFAS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

**AFFF Containing PFAS is Fungible and Commingled in the Groundwater**

133.    Once it has been released to the environment and groundwater, AFFF containing PFAS, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF.

134.    The process of manufacture and distribution of AFFF, including that which contains PFAS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

135.    A subsurface plume, even if it comes from a single location, such as a retention fire training area, most likely originates from mixed batches of AFFF containing PFAS coming from different manufacturers.

136.    The case at RFTC is typical: even though several areas were located at the base and/or airport where the AFFF was used and entered the groundwater, neither the federal nor state investigators could determine the identity of the manufacturers whose AFFF containing PFAS contributed to the resulting groundwater contamination plume.

137.    Because precise identification of the specific manufacturer of any given AFFF product that was the source of PFAS in the groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

138.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF containing PFAS, at Plaintiff's expense, and to attempt to avoid liability for their contamination of the groundwater.

**Health Effects of PFOS and PFOA Exposure**

20

139.    As discussed above, none of the Defendants complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their PFAS products. *See* TSCA § 8(e).

140.    In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

141.    PFAS have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

142.    Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

143.    The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

144.    On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. See, Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)[2].

145.    Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

---

[2] *https://www.epa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf*, at p. 1, n. 1 (last visited June 5, 2018)

146.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

147.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

148.    The injuries caused by PFAS can arise months or years after exposure.

149.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

150.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

151.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

152.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

**Federal and State Standards for PFAS**

153.    On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion). See, Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

154.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

---

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environmental Health Perspectives 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

155.    On August 20, 2018, the Alaska Department of Environmental Conservation ("ADEC") issued a Technical Memorandum to provide "consistent guidance on responding to [PFAS] in groundwater and surface water, and to establish health-based action levels for drinking water."

156.    No maximum contaminant level had been established for PFAS compounds under the Safe Drinking Water Act, but ADEC considered the following PFAS compounds to be hazardous substances: PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS. The Technical Memorandum stated that the action level for PFOS, PFOA, PFNA, PFHxS, or PFHpA was 0.07 µg/L (i.e., 70 parts per trillion) for the sum of the concentrations for all detected compounds. For PFBS, the action level was 2.0 µg/L (i.e., 200 parts per trillion).

157.    On April 9, 2019, ADEC issued an updated Technical Memorandum "[i]n order to align state actions to the recently announced EPA plans." The updated Technical Memorandum states that the action level is 0.07 µg/L for PFOS and PFOA only.

158.    ADEC has stated that, notwithstanding the updated Technical Memorandum, those who began receiving drinking water prior to April 9, 2019, based on the action level for any of the substances described in the August 20, 2018 Technical Memorandum, will continue to receive water.

**Fairbanks Regional Fire Training Center**

159.    The Fairbanks Regional Fire Training Center ("RFTC") is located at 30th Avenue and Lathrop within Fairbanks city limits. Constructed in 1987 as a state-owned facility, the burn pit at the RFTC was used for firefighting exercises for about twenty years. These exercises involved filling the pit with water, floating petroleum products (*e.g.*, jet fuel, diesel fuel, and/or

gasoline) on the water, igniting the fuel, and extinguishing the ensuing fire by flowing foam over it.

160.    In 2014, to prepare the pit for decommissioning, ADEC sampled the standing water and sediment in the pit; petroleum and PFAS compounds were detected in the water. ADEC recommended further site characterization.

161.    In 2015, upon ADEC's approval of its work plans, the City contracted for the excavation of the burn pit at the RFTC and removal of the contaminated soil to a certified landfill. The City worked closely with the ADEC Division of Spill Prevention and Response throughout the entire cleanup process.

162.    After the initial discovery of contamination at the RFTC burn pit and its subsequent remediation, the City began identifying and testing both extant monitoring wells and drinking water wells in the vicinity of the RFTC. It provided bottled drinking water free of charge to the residents of properties testing above the LHA until permanent water service connections to the public water system could be established.

163.    Public drinking water in the greater Fairbanks area is provided by two privately-held, publicly-regulated utilities operating as College Utilities Corporation and Golden Heart Utilities, Inc., both subsidiaries of Fairbanks Sewer and Water. Ordinance 6060 called also for all Category 1 properties to be connected to the public water system by December 2017 and for all Category 2 and Category 3 properties to be connected to the public water system by September 2018.

164.    Finally, the Ordinance provides for all Category 1, 2, and 3 properties to receive a $2,500 stipend to cover the cost of water for approximately two years. These stipends have been paid directly by the City on consumers' accounts with College Utilities and Golden Heart Utilities.

165.    The City has funded all costs of investigation, monitoring, abatement, remediation, and regulatory oversight; bottled water delivery to affected residents; design, engineering, construction, and hookups; and the payment of water stipends.

166.    The use of Defendants' AFFF at the RFTC has impacted the soil and groundwater in and around the RFTC, causing damages to the Borough.

**PFAS Contamination in the Borough**

167.    All Defendants manufactured, marketed, and sold AFFF used at bases and fire training facilities and other locations throughout the country, including in Alaska.

168.    In July 2016, FNSB sports Complexes, located northwest of the RFTC between the Mitchell Expressway and Eagan Avenue in west Fairbanks (FNSB Parcel Account Numbers [PANs] 593460 and 536555) was identified as being contaminated with PFAS. The PFAS results for the two locations exceeded the cleanup level of 400 ng/L, including from the IGSA well between fields 1 and 2 and the IGSA well between fields 3 and 4.

169.    A December 2016 Private Summary Report for the City of Fairbanks provided to ADEC documented PFOA and PFOS in two groundwater wells located at South Davis Park, owned by the Borough. The results from analytical testing conducted July 18, 2016, documented concentrations of PFOS for the northwestern and southeastern wells at 740 nanograms per liter (ng/L) and 770 ng/L, respectively. These concentrations exceed DEC's PFOS groundwater cleanup level of 400 ng/L promulgated in 18 AAC 75.345. DEC requested that the northwestern and southeastern irrigation wells located at South Davis Park be taken out of use unless a water treatment system is installed.

170.    In 2018, Plaintiff received notice from the ADEC about more findings of PFAS contamination in the groundwater.

171.    One such contaminated site included ground water contamination in two wells at the Plaintiff owns South Davis Park area. This area is the location of the youth soccer and softball fields complex and other outdoor recreation facilities.

172.    South Davis Park's wells, including IGSA East fields, FYSA South Davis Northwest; IGSA West Fields all exceeded the regulatory contamination limit for PFAS.

173.    In the course of monitoring the situation, the FNSB has identified additional wells that appear to be at risk of contamination from the plume that originated at the RFTC.

174.    Water samples from three FNSB irrigation wells at the Davis Sports Complex and Fairbanks Dog Park were tested. PFAS contamination was detected from the Golden Heart Softball Association (GHSA) and the Hez Ray Complex irrigation well. The well locations at the Hez Ray Sports Complex which were contaminated with PFAS included GHSA Hez Ray fields 2&3; GHSA Hez Ray fields 1 &4; and FYSA Main Complex west vehicle track, which all exceeded the Alaska regulatory contamination limit.

175.    Plaintiff also received notice in 2018 that both wells on the fields used by Interior Girls Softball Association, Inc. exceeded ADEC's regulatory level of 400 ng/L and was told these wells must immediately be taken out of service because the wells' discharge violated Alaska's statutory health and safety standards.

176.    Other FSNB properties with PFAS contamination include the 2019 results of Pioneer Park Duck Pond, reaching 188 ng/L if PFOS,

177.    Plaintiff now plans to do more testing to determine the scope of contamination to Borough lands. The contamination has rendered their contaminated wells useless. In the abundance of caution, other wells were taken out of service and remain offline.

178.    These properties previously served by Plaintiff's now contaminated wells will

27

likely need to connect to the public supply wells to obtain safe, filtered drinking water.

179.    Additional costs may be incurred as a result of future PFAS detections at other private wells, and other remedial measures that Plaintiff may be obliged to take to protect its residents from the impacts of Defendants' contamination.

180.    Other costs for the Borough include investigating, monitoring, remediating, and otherwise responding to the PFOA/PFOS water contamination to mitigate the threat to public health and the environment caused by Defendants' AFFF products.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

181.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as in fully set forth herein.

182.    Defendants in this action are manufacturers that control a substantial share of the market for PFAS products in the United States and are jointly responsible for the contamination of the groundwater and for causing the damages complained of in this Complaint.

183.    Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for PFAS materials at issue in this Complaint.

184.    PFAS is fungible once it is released into the environment. It is impossible to identify the exact Defendant who manufactured any given product containing PFAS found in the air, soil, surface water, and/or groundwater.

185.    Each Defendant participated in both the Alaska and national markets for PFAS products during the relevant time.

186.    Market share liability attaches to all Defendants, such that the liability of each should be assigned according to its percentage of the market for PFAS in Alaska at issue in this Complaint.

187.    Concert of action liability attaches to all Defendants, each of whom participated in a common plan to commit the torts alleged herein and each of whom acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous PFAS products.

188.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## As and for a First Cause of Action:

## NEGLIGENCE

189.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

190.    Defendants knew or should have known that exposure to PFOA and PFOS is hazardous to the environment and to human health. The use of AFFF at the RFTC for firefighting exercises was a reasonably foreseeable use. Defendants knew or should have known that AFFF used in this manner would contaminate soil and groundwater with PFAS, making a significant threat to drinking water supplies. Defendants had a duty to prevent the release of PFAS, including but not limited to PFOS and/or PFOA, in the foreseeable use of their AFFF.

191.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies when released into the environment.

192.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the wells that provided drinking water to the communities within the Borough.

193.    It was foreseeable that PFAS products would contaminate the surrounding environment, groundwater, and drinking water supplies of the surrounding communities.

194.    Defendants therefore knew or should have known that safety precautions should be required to prevent the release of PFAS into the surrounding environment, groundwater, and drinking water supplies.

195.    Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous PFAS products into the marketplace when its release into the drinking water supplies was imminent and certain.

196.    Defendants owed a duty to Plaintiff not to contaminate the surrounding environment and groundwater with PFAS products.

197.    Defendants further breached their duty by failing to stem the migration of the groundwater contamination and prevent it from reaching private drinking water supplies.

198.    Defendants, as manufacturers, marketers, and sellers of PFAS products owed Plaintiff a duty to exercise reasonable care to ensure that PFAS products were manufactured, marketed, and sold in such a way as to ensure that the end users were aware of the potential harm PFAS causes to human health and the environment.

199.    As manufacturers, marketers, and sellers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their PFAS products to prevent the release of PFAS into the surrounding environment.

200.    Defendants had a duty to warn of the hazards associated with PFAS products, entering and poisoning the environment and groundwater.

201.    Upon learning of the release of the contaminants, Defendants owed Plaintiff a duty to warn and notify it of the release of the contamination before it injured Plaintiff and/or to act reasonably to minimize the damage to Plaintiff.

202.    Defendants breached duties owed to Plaintiff by allowing PFAS to be released into the groundwater and contaminate private wells that provided drinking water to properties in the Borough and failing to warn and notify the end users and/or the Borough of the resulting danger.

203.    As such, Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties owed to Plaintiff.

204.    Defendants further breached the duties owed to Plaintiff by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

205.    Defendants' breaches of their duties were the direct and proximate causes of Plaintiff's injuries and damages.

206.    As a result of Defendants' breach of their duty to timely notify Plaintiff and act reasonably in warning of the presence of PFAS, Plaintiff was forestalled from undertaking effective and immediate remedial measures.

207.    Plaintiff has suffered foreseeable damages as a proximate result of Defendants' breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiff, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiff.

208.    As a direct and proximate result of Defendant's' breach of their duties as set forth above, Plaintiff has suffered foreseeable damages and has expended and will be forced to expend significant resources to test, monitor, and address the contamination caused by Defendants' negligence for many years to come.

209.    As a direct and proximate result of Defendants' acts and omissions as set forth above and the resulting contamination, Plaintiff has suffered damages, including but not limited to

the costs incurred and to be incurred in responding to the PFAS contamination of the groundwater supply, costs expended on providing home delivery of bottled water to residents, public water main extensions, investigative costs, engineering costs, sampling, monitoring, and remediation costs.

210.    Defendants knew it was substantially certain that their acts and/or omissions would cause injury and damage. Their actions and omissions were done with actual malice, with wanton, willful, and/or reckless disregard for Plaintiff's rights.

211.     Defendants are jointly and severally liable for all such damages.

212.    Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**As and for a Second Cause of Action:**

**NEGLIGENCE PER SE**

213.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

214.    Defendants had a duty to comply with applicable laws, regulations and guidelines applicable to them.

215.    Upon information and belief, Defendants failed to manufacture AFFF containing PFOA and PFOS in compliance with the applicable laws and regulations relevant to air, soil and water quality protection.

216.    These laws and regulations were intended for the protection of the environment and public health.

217.    Plaintiff is whom protection was intended for by the drafters of such laws and regulations.

218.    These violations were a direct and proximate cause of the substantial damages and

imminent, substantial and impending harm to the Borough and the surrounding areas.

219.    The risk of damages and the imminent, substantial and impending harm to Plaintiff is precisely the types of injuries the applicable laws were designed to prevent.

220.    Violation of these laws and regulations thereby constitutes *per se* negligence. The amount of damages for the injuries will be established at the time of trial and said amount exceeds the jurisdictional limits of all of the lower courts.

**As and for a Third Cause of Action:**

**PRODUCTS LIABILITY – FAILURE TO WARN**

221.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully set forth herein.

222.    Defendants knew or should have known that exposure to PFAS is hazardous to the environment and human health.

223.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the wells that provided drinking water to Plaintiff and Plaintiff-owned properties.

224.    Knowing of the dangerous, hazardous and toxic properties of the PFAS products, Defendants had the duty to warn of the hazards associated with PFAS entering and poisoning the environment and groundwater.

225.    Defendants failed to provide sufficient warning to the end users, the public, and Plaintiff that the manner in which PFAS products were used and stored caused their release into the environment and cause the contamination of the environment, groundwater, and drinking water, with PFOA, PFOS, and potentially other toxic substances.

226.    Adequate instructions and warnings on the PFAS products could have reduced or avoided these foreseeable risks of harm to the environment and the threat to public health.

227.    Had Defendants provided adequate warnings, Plaintiff could have taken measures to avoid or lessen the exposure.

228.    Had Defendants provided adequate warnings, the end users of PFAS products including the Sports Complexes, could have taken steps to reduce or prevent the release of PFOA and PFOS into the environment, groundwater, and drinking water.

229.    Defendants' failure to warn was a direct and proximate cause of the environmental impact from PFOA and PFOS that came from the use, storage and disposal of PFAS products at RFTC.

230.    As such, Defendants' failure to provide adequate and sufficient warnings for the PFAS products that they manufactured, marketed, and sold renders PFAS a defective product.

231.    As a result of Defendants' conduct and the resulting contamination, the Plaintiff has been forced to incur significant costs in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended on providing alternative, safe, bottled water to residents with contaminated private wells, public water main extensions, investigative costs, engineering costs, environmental sampling, monitoring, and remediation costs.

232.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

233.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of Plaintiff.

**As and for a Fourth Cause of Action:**

**PRODUCTS LIABILITY – DEFECTIVE DESIGN**

234.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully set forth herein.

235.    Defendants knew or should have known that exposure to PFAS is hazardous to the environment and human health.

236.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products was hazardous to the environment and human health.

237.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling PFAS products would result in the contamination of the private wells that provided drinking water to properties of Plaintiff.

238.    Knowing of the toxic, dangerous, and hazardous properties of the PFAS products, Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain PFAS.

239.    These alternative designs and/or formulations were already available, practical, and technologically feasible.

240.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to environment and human health that was caused by the Defendants' manufacture, marketing, and sale of PFAS products.

241.    The PFAS products manufactured, marketed, and sold by the Defendants are toxic, dangerous to the environment and human health, mobile, and persistent, such that the act of designing, formulating, manufacturing, marketing, and selling them was unreasonably dangerous under the circumstances.

242.    The PFAS products manufactured, marketed, and sold by the Defendants were defectively designed as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

243.    Defendants' defective design and formulation of PFAS products was a direct and proximate cause of the environmental impacts from PFOA and PFOS that came from the use and storage of PFAS products at RFTC.

244.    As a direct result of Defendants' defective design and formulation of PFAS products and the resulting contamination and danger to human health, Plaintiff has been forced to incur significant costs in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended providing bottled water to residents whose private wells have been contaminated with PFAS, public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediation costs.

245.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

246.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff.

**As and for a Fifth Cause of Action:**

**PUBLIC NUISANCE**

247.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

248.    At all times relevant to the present cause of action, Defendants were manufacturers of PFAS products that were used for decades and were discharged or disposed of in a dangerous

way, and/or otherwise cause the contamination of private wells within the area, as a result of these wells' proximity to RFTC.

249.    Defendants have manufactured PFAS products, in a manner that created a public nuisance and that unreasonably endangers or injures the Plaintiff, causing inconvenience and annoyance.

250.    The improper use, handling, storage, release, discharge or dispose of Defendants' PFAS products has contaminated drinking water, the environment, soil, property and the Plaintiff's natural resources and drinking water supplies, thus causing a public nuisance.

251.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFAS to be disbursed through the groundwater, causing a substantial interference with the use of Plaintiff's natural resources and drinking water supplies.

252.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFAS to be released into the drinking water for the Borough, interfering with the health of a considerable number of persons.

253.    The introduction of unknown quantities of PFAS into private wells unreasonably interfered with the use of Plaintiff's natural resources and drinking water supplies, such that it is offensive and has caused significant inconvenience or annoyance.

254.    The potential danger from the drinking water has caused the Plaintiff significant inconvenience and expense, interfering with the use of the Borough's natural resources and ground water supply.

255.    Defendants are strictly, jointly, and severally liable to the Plaintiff for all resulting damages, including the costs incurred and to be incurred in responding to the PFAS contamination.

256.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff has suffered and continue to suffer damages in responding to the contamination to the private water supplies from PFAS, including but not limited to the costs expended on providing alternative water to residents whose private wells have been contaminated, public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediating costs.

257.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**Claim for Punitive Damages**

258.    Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

259.    At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the PFAS products that were used at RFTC and that resulted in the contamination of the private water wells in the Borough.

260.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFAS would and/or could be introduced into the environment, causing contamination of surface and groundwater, as well as private drinking water wells.

261.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFAS to be released into the environment.

262.    The willful, wanton, malicious, and/or reckless conduct of Defendants, includes, but is not limited to:

　　　　a.    issuing no warnings and failing to divulge material information concerning the release of PFAS, including but not limited to PFOA and PFOS;

b.  knowing of the probability of long-lasting water contamination, including, specifically, high risks to groundwater posed by their PFAS products, and failing to prevent such contamination;

c.  failing to take all reasonable measures to ensure PFAS products would be effectively disposed of and not discharged into the surrounding environment;

d.  failing to prevent the foreseeable impacts of PFAS contamination upon the Plaintiff.

263.    As a result of Defendants' conduct, Plaintiff has been forced to incur and will continue to incur significant costs in responding to the contamination of its water supplies and multiple wells by PFAS, including but not limited to the costs expended on providing alternative water to residents whose private wells have been contaminated, public water main extensions, investigative costs, engineering costs, sampling, monitoring and remediation costs.

264.    Defendants have demonstrated an outrageous conscious disregard for the environment and acted with implied malice, warranting the imposition of punitive damages.

265.    On information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.  Compensatory damages that exceed the jurisdictional limit of this court;

B.  Punitive damages that exceed the jurisdictional limit of this court;

C.  Reasonable fees for attorneys and expert witnesses;

D.  Costs and disbursements of this lawsuit;

E.  Interest on the damages according to law; and

F.  Any other and further relief as the Court deems just, proper and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:   January 31, 2020

Respectfully Submitted,

**NAPOLI SHKOLNIK, PLLC**

By: /s/ Paul J. Napoli Esq.
Paul J. Napoli, Esq.
Patrick Lanciotti, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
pnapoli@napolilaw.com
planciotti@napolilaw.com